# FOR PUBLICATION

FILED & ENTERED

SEP 28 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Ogier      DEPUTY CLERK

1
2
3
4
5
6
7

8          **UNITED STATES BANKRUPTCY COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10         **SAN FERNANDO VALLEY DIVISION**

11
12
13

14   In re:                                    **Case No.: 1:15-bk-12116-MB**

15   REXFORD PROPERTIES LLC, a California       **Chapter 11**
     limited liability company,
16                                              **OPINION RE: CLASSIFICATION AND**
                Debtor.                         **IMPAIRMENT**
17
18
19
20
21
22
23
24
25
26
27
28

Rexford Properties LLC, debtor and debtor in possession herein ("Rexford" or the "Debtor"), requests pursuant to Federal Rule of Bankruptcy Procedure 3013 ("Rule 3013") an order: (i) approving a proposed classification scheme for nonpriority unsecured claims under a prospective plan of reorganization for Rexford, and (ii) a determination that its proposed payment under a plan of 100% of certain trade claims—subject to a contractual undertaking to continue providing goods and services on specified terms and conditions—would constitute "impairment" within the meaning of the Bankruptcy Code. The relief regarding classification is opposed by creditor United States Fidelity & Guaranty Company ("USF&G"). This Memorandum constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Bankruptcy Procedure 7052.

As explained below, the Court concludes (i) subject to certain modifications, the proposed classification scheme is appropriate and (ii) that the proposed treatment of certain vendor claims constitutes impairment. But it is critical that the parties understand the limitations of this ruling.

First, the Court is not making any determination as to whether the proposed disparate treatment of unsecured creditors constitutes "unfair discrimination" for purposes of cramdown under Bankruptcy Code section 1129(b)(1). Although Rule 3013 contemplates the consideration and approval of a proposed classification scheme in advance of the plan confirmation process, it does not contemplate the Court making advance determinations of other confirmation issues such as unfair discrimination. The question of unfair discrimination does not arise until and unless a debtor seeks confirmation of a plan notwithstanding its failure to satisfy Bankruptcy Code section 1129(a)(8).

Second, it is not appropriate on a Rule 3013 motion to make a determination as to the good faith of the plan proponent under Bankruptcy Code section 1129(a)(3). Thus, although the Court finds that the proposed treatment of trade claims contemplated by Rexford would technically constitute "impairment" within the meaning of Bankruptcy Code section 1124, the Court cannot at this point resolve the apparent disagreement between the parties as to whether the impairment has been proposed in good faith. *See Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel Assocs.)*, 165 B.R. 470, 474 (B.A.P. 9th Cir. 1994). A determination of Rexford's good faith in

1  proposing the plan—and all of the provisions contained therein—must wait until the plan

2  confirmation hearing, when a more fulsome record has been established by the parties.

## I.    JURISDICTION

4  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  Venue in this

5  Court is proper pursuant to 28 U.S.C. § 1409(a).  This is a core matter pursuant to 28

6  U.S.C. § 157(b)(A), (L) & (O), and therefore the Court has the constitutional authority to enter a

7  final judgment in this matter.  *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

## II.    BACKGROUND

9  Rexford is a California limited liability company that owns and operates the "Island

10  Waterpark" in Fresno, California (the "Waterpark").  Rexford commenced this case on June 16,

11  2015 (the "Petition Date") by filing a voluntary petition for relief under chapter 11 of the

12  Bankruptcy Code.  Rexford is in possession of its assets and is continuing to operate its business as

13  a debtor in possession, in accordance with Bankruptcy Code sections 1107(a) and 1108.  On

14  February 29, 2016, Rexford filed a plan of reorganization and proposed disclosure statement.  At a

15  hearing held April 5, 2016, the Court denied approval of the proposed disclosure statement.

16  Rexford thereafter began to prepare a revised plan, which it has stated will revise the classification

17  scheme and treatment of unsecured claims.

18  In aid of that effort, on May 6, 2016, Rexford filed the motion currently before the Court:

19  the *Motion Pursuant to Fed. R. Bankr. P. 3013 Authorizing Separate Classification of Trade*

20  *Creditors and Determining Impairment* (the "Motion").  Case Dkt. 258.  In support of the Motion,

21  Rexford filed (i) excerpts of its proposed plan describing the classification and treatment of

22  unsecured claims, Case Dkt 258-1 ("Exhibit A"); (ii) the declaration of the manager of the

23  Waterpark, Amber Watson, Case Dkt. 258-2 (the "Watson Declaration"), and (iii) the declaration

24  of the managing member of Rexford, Lisa Ehrlich, Case Dkt. 258-3 (the "Ehrlich Declaration").

25  Pursuant to the Motion, Rexford seeks approval for the following classification scheme for

26  unsecured creditors under a prospective amended chapter 11 plan:

27
     A convenience class consisting of all general unsecured claims under $2,500
     (the "Convenience Class"); a trade class consisting of claims that are over $2,500
28   and are held by trade creditors with whom the Debtor expects to have a continuing

relationship (the "Trade Class"), and (iii) a class consisting of the remainder of the general unsecured claims that do not fit into the Convenience Class or the Trade Class as described above (the "General Unsecured Creditors Class").

Motion at 3.  The Motion further explains:

> The Trade Class will be paid 100% of their claim on the Effective Date; however payment will be conditioned upon such party's agreement to continue supplying goods and services to the Debtor for one full operating season post-confirmation in accordance with trade terms at least as favorable to the Debtor [sic] as those practices (including pricing, timing of payments, availability, and other terms) in place before the Petition Date.

> A vote in favor on the ballot will function as a binding contractual arrangement between the parties governing the trade relationship of the terms explained above (and in the Amended Plan) such that a creditor's vote to accept the Amended Plan will bind the creditors to this arrangement, provided that the Debtor also performs.

Motion at 4.  According to the Ehrlich Declaration, the total amount of the claims in the Trade Class contemplated by Rexford's proposal would be approximately $295,000, although the members of the Trade Class and the amount of their claims was not specified in that declaration. Ehrlich Declaration at ¶ 6.

According to the plan excerpts attached as Exhibit A to the Motion, the holders of Convenience Class claims likewise would be paid 100% of their allowed claims on the effective date of the Debtor's plan.  Exhibit A at 7.  No estimate was provided in the Motion as to the amount of the Convenience Class claims.

In contrast to the holders of claims in the proposed Trade Class and Convenience Class, the holders of claims in the proposed General Unsecured Creditors Class would receive either: (i) payment of 10% of their allowed claims or (ii) a pro rata share of 45% of the equity interests in the reorganized debtor entity contemplated by the plan.  Exhibit A at 8-10.  Rexford's stated explanation for the separate classification and disparate treatment of the General Unsecured Creditors Class is simple: (1) there is not enough cash to pay all creditors 100% of their claims and (2) its failure to pay its trade creditors in full under the plan would adversely affect its operations and ability to reorganize.  Motion at 5-7.

The General Unsecured Creditors Class contemplated by Rexford would include an unsecured claim in excess of $1.9 million held by USF&G and five unsecured claims asserted in excess of $18 million that USF&G contends are insider claims.[1]  Rexford contends that if those claims were placed in the same class as the Trade Class, "each creditor in such combined class would receive a pro rata distribution of approximately 1.6% of its claim on the Effective Date." Motion at 6.

On May 13, 2016, USF&G filed its opposition to the Motion (the "Opposition").  Case Dkt. 274.  USF&G's claim is based on a prepetition judgment against Rexford.  USF&G complains in its Opposition that under the proposed classification scheme and plan treatment, (i) "Debtor's insiders, friends, and family would retain control of the Debtor and all of its real and personal property assets" and (ii) "an artificially created non-insider, unsecured creditor class, which is artificially impaired . . . will receive 100% payment on Plan confirmation and, thus, is likely to consent to the Proposed Plan, and most non-related creditors except USF&G will be paid in full." Opposition at 2.   Further, USF&G questions the necessity of treating trade vendors in this manner, arguing that the goods and services purchased by Rexford were not unique and that many vendors had continued to do business with Rexford during the pendency of the case.  Opposition at 3-4. Notably, neither the Ehrlich Declaration nor the Watson Declaration identified the members of the proposed Trade Class—let alone provided specific evidence as to why it was appropriate for each of those vendors to be included in the Trade Class.

On May 31, 2016, in response to the Opposition, Rexford filed the *Supplemental Declaration of Amber Watson in Support of Motion Pursuant to Fed. R. Bankr. P. 3013 Authorizing Separate Classification of Trade Creditors and Determining Impairment* (the "Supplemental Watson Declaration").  Case Dkt. 289-1.  The Supplemental Watson Declaration contains testimony, "[b]y way of example," describing 12 of its vendors and the reasons Rexford

---

[1]   Pursuant to separate motions, (i) USF&G has objected to the five unsecured claims and (ii) Rexford has sought a determination that some of these claims are not held by insiders.  The resolution of those motions has been addressed in separate written memoranda of the Court.

1  believed these vendors should be classified separately.  Supplemental Watson Declaration at ¶ 8.

2  But it was clear from the carefully worded testimony in this declaration that these were only

3  *examples.  See id.; see also id.* at ¶ 9 ("Several of these vendors, and many other trade creditors,

4  have repeatedly contacted me and expressed dissatisfaction with the Debtor as a result of their

5  unpaid, pre-petition claims") (emphasis added).  In other words, although Rexford provided

6  testimony regarding the importance certain of its vendors, it nevertheless sought approval of a class

7  comprised of *all* vendors, including those as to which no specific testimony substantiating such

8  classification was provided.

9  　　　　The Court held its initial hearing on the Motion on June 7, 2016.  The Court advised the

10  parties that it would not approve the separate classification of all trade vendors, in a class designed

11  to provide preferential treatment to those creditors, without an evidentiary showing regarding each

12  of the trade vendors to be included in that class.  The Court noted that there were numerous other

13  creditors that had filed claims or been scheduled by Rexford, but that were not addressed in the

14  Supplemental Watson Declaration.  The Court, however, continued the hearing and provided

15  Rexford the opportunity to narrow its request and/or supplement the evidentiary record.  The Court

16  provided USF&G an opportunity to object to any subsequent submission by Rexford.

17  　　　　On June 10, 2016, Rexford filed the *Supplement to Motion Pursuant to Fed. R. Bankr. P.*

18  *3013 Authorizing Separate Classification of Trade Creditors and Determining Impairment*

19  *Amending Proposed Trade Class* (the "Motion Supplement") and the *Second Supplemental*

20  *Declaration of Amber Watson in Support of Motion Pursuant to Fed. R. Bankr. P. 3013*

21  *Authorizing Separate Classification of Trade Creditors and Determining Impairment* (the "Second

22  Watson Declaration").  The Motion Supplement and the Second Watson Declaration identified a

23  finite list of 14 vendors that Rexford proposed be included in its Trade Class and provided an

24  explanation for its selection of each of these vendors.

25  　　　　USF&G did not file any written reply to the Motion Supplement, any evidentiary objections

26  to the Second Watson Declaration, or any request to cross-examine Watson with respect to the

27  Second Watson Declaration.  However, at the continued hearing held June 20, 2016, USF&G

28  argued that the evidence presented by Rexford did not justify the proposed separate classification

1  of 12 of the 14 vendors, because Rexford did not demonstrate that the preferential treatment of

2  these vendors would be "critical," "essential," or "necessary" to the success of Rexford's

3  reorganization.[2]  USF&G noted that Rexford, in its own pleadings, previously had identified these

4  as the appropriate standards for the separate classification of vendor claims.  Nevertheless, in

5  response to USF&G's arguments at the hearing, Rexford argued that its only obligation was to

6  demonstrate a legitimate business or economic justification for the proposed separate classification

7  and that the uncontroverted Second Watson Declaration had amply satisfied this standard.

8                    **III. THE PROPOSED TRADE CLASS**

9          Based on the Second Watson Declaration, the following is a summary of the 14 vendors

10  that Rexford proposes to include in its Trade Class and a description of the importance of each

11  vendor to its Waterpark business.  All of Watson's testimony was admitted and none of it was

12  controverted.

13          1.    J&D Food Service ("J&D").  J&D holds a claim of $31,630.78.   J&D is a local

14  supplier of food beverage and cleaning supplies.  Food revenue constituted 22% of the Waterpark's

15  revenue and 55% of that revenue is from the sale of products provided by J&D.  In 2015, the

16  Waterpark purchased $104,000 in goods from J&D.  According to Watson, J&D is valued by

17  Rexford for its prices, service, and variety of products.  Watson testified that J&D stores large

18  quantities of items selected for the Waterpark, and provides deliveries when specialty items run

19  low.  Watson explained that alternative vendors are located a two hours' drive away, have

20  inflexible delivery schedules and do not store specialty inventory that is available on request.

21  Further, Watson testified that if Rexford were forced to replace J&D it would likely pay 5% more

22  than the pricing currently provided.

23          2.    Sierra Chemical Company ("Sierra").  Sierra holds a claim of $19,459.93.  Sierra is

24  the only bulk chlorine and muriatic acid distributor in the Fresno area.  Rexford requires these

25

26  [2]   At the July 20 hearing, USF&G's counsel conceded that two of the vendors, Premier Media
27  Group and Mark Stewart, were critical to the business, because they provide services for which
    there is no alternative.  Transcript at 9:16-21.

28

chemicals to comply with applicable law and maintain proper sanitation in the Waterpark.  Rexford buys these chemicals directly from Sierra.  If Rexford purchased these chemicals from any of the alternative vendors in Fresno it would pay more; all of those vendors are intermediaries, who themselves purchase their inventory from Sierra.

3.    Valley Wide Beverage ("Valley Wide").   Valley Wide holds a claim of $17,811.82.  Valley Wide is Rexford's exclusive beer distributor.  Beer revenue was approximately $150,000 during the 2015 season, account for about 22% of total food & beverage sales (excluding catering).  The one other beer distributor that is available to the Waterpark does not carry the brands that are most popular in  the Waterpark's demographic, including in particular Corona and Modelo.

4.    Dippin Dots, Inc. ("Dippin Dots").  Dippin Dots holds a claim of $17,620.23.  Dippin Dots provides their ice cream novelty product, which accounted for approximately $132,000 in revenue during the 2015 season, which was 20% of the total food and beverage sales (excluding catering).  Watson testified to her belief that there is no alternate novelty ice cream product that would perform as well as Dippin Dots as an "impulse buy."  Watson believes that without the product, Rexford would experience a loss of revenue.

5.    Premiere Media Group ("Premiere").  Premiere holds a claim of $13,167.00.  Premiere is the advertising and public relations agency for the Waterpark, handling public relationship, TV advertising, print advertising, social media, coupon distribution, and guest inquiries on the Waterpark's website.  Premier has approximately six years of experience working with the Waterpark, specialized knowledge of its operations and advertising needs, and exclusive relationships with large retailers for coupon distribution and marking inclusion in print and television advertising.  Watson testified that based on those exclusive relationships, Premiere is irreplaceable.  Moreover, even if that were not the case, Watson testified that it would take 5-6 years of collaboration with any alternate vendor to realize the kind of service Rexford currently enjoys with Premiere.

6.    Lotus Fresno ("Lotus").  Lotus holds a claim of $5,660.00.  Lotus is the number one radio station in the Waterpark's demographic, which includes a significant number of Hispanic customers, who listen to a select few  Spanish-language radio stations. Watson described Rexford's

relationship with Lotus as "a crucial part of the Waterpark's marketing efforts." Watson estimated that if Rexford's relationship with Lotus did not continue, the number of visitors to the Waterpark would decline by roughly 5 to 7 percent.

7.    Barry Owen Co., Inc. ("Barry Owen").  Barry Owen holds a claim of $5,574.40. Barry Owen is an imported souvenir goods distributor that provides approximately 70% of the Waterpark's gift shop merchandise.  Watson testified that the items Barry Owen provides are difficult to find from alternative vendors, that the pricing is good, and Barry's Owen's location in Los Angeles keeps shipping costs low and delivery times quick.  Further, Watson testified that Barry Owen is always ready to ship product to Rexford, rather than having to back order the goods that Rexford needs for the Waterpark.

8.    Mark Stewart ("Stewart").  Stewart holds a claim of $3,965.00.  Stewart is the local contractor responsible for the original planning, development and buildout of the Waterpark   As such, he has substantial knowledge of the pumps, motors, relays, electrical systems, filtration systems, and other features of the Waterpark.  Watson described him as often a "one stop shop" for identifying maintenance and mechanical problems and solutions, for which there is "no alternative."  Watson also testified that Stewart's deep knowledge of the Waterpark saves Rexford a "significant" amount of money.

9.    Cumulus.  Cumulus holds a claim of $3,819.90.  Cumulus is one of the largest radio broadcasting companies in the Fresno area and carries channels that are among the top of the in the local market, including those that target the Waterpark's desired demographics.  If the relationship between Rexford and Cumulus were terminated, Watson expects that the Waterpark's revenue would be reduced by roughly 5 to 7 percent.

10.    Swimsuit Station.  Swimsuit Station holds a claim of $3,381.95.  Swimsuit Station offers "off-price" swimwear at a fraction of the price that other wholesalers charge.  Watson testified that she has tried multiple times to search for an alternative vendor with comparable offerings at similar prices and has not been successful.

11.    Jakes Associates ("Jakes").  Jakes holds a claim of $3,379.81.  Jakes is a state certified company that is needed for the completion of mandatory annual quality safety inspections.

1  Jakes is the only certified company of its kind that Watson has been able to identify in California.

2  Watson testified that if Rexford could not use Jakes, it would have to hire inspectors from out-of-

3  state "who would charge exorbitant fees for travel."

4      12.    Power System Testing Co. ("Power").  Power holds a claim of $2,878.26.  Power is

5  the only vendor in the Central Valley that Watson has been able to identify as being able to provide

6  the Waterpark with a ground fault electrical systems test in the event of an emergency black-out.

7  Watson testified that although this is not an event that happens every day, it is something that

8  happens with some regularity, is a severe issue when it does arise, and can significantly impact the

9  Waterpark's operations.  Watson is not aware of any replacement for Power.

10      13.    Fresno Pipe & Supply, Inc. ("Fresno Pipe").  Fresno Pipe is the only vendor in

11  Fresno that carries the specialty, industrial plumbing and piping that the Waterpark uses for its

12  filtration and attractions.  When this product is needed, it is often due to mechanical emergencies

13  that may shut down one or more attractions until the component is replace or repaired.  Watson

14  testified that alternative suppliers of these specialty materials would be out of town and require two

15  or more days to deliver those materials.

16      14.    F.N.F Roll Off Service ("FNF").  FNF holds a claim of $2,569.62.  FNF provides

17  roll-off and dumpster services for the Waterpark.  Watson testified that she has compared the

18  services provided by FNF to those of other vendors and concluded that FNF has the best pricing

19  and fastest response time.  She estimated that working with another vendor would come at a

20  substantially higher cost to Rexford of approximately 50%.

21      As a general matter, Watson testified that all of these relationships had been developed over

22  a period of several years to the point where these vendors are now providing goods and services at

23  prices that enable Rexford's business to "operate at an optimum level."  Watson explained that if

24  Rexford were forced to replace these vendors, it would require another multi-year effort to build-up

25  the level of knowledge, goodwill, terms and services that Rexford now enjoys from these vendors.

26  Further, Watson expressed her concern that if these trade vendors were to receive 10% or less of

27  their prepetition claims, Rexford would lose the goodwill that it has developed with them over the

28  years and lose the support of these vendors going forward.  Watson stated that if Rexford lost the

1  support of multiple vendors at the same time, it would be "catastrophic," resulting in "cumulative

2  detrimental effect" on Rexford's business, jeopardizing its economic stability and undermining the

3  Debtor's likelihood of successfully performing under a plan of reorganization.

4                                    **IV. LEGAL ANALYSIS**

5         Rexford seeks (i) approval of its proposed classification scheme, including the Trade Class,

6  and (ii) a determination that its proposed treatment of the Trade Class constitutes "impairment"

7  within the meaning of the Bankruptcy Code.  Each of these requests for relief is addressed in turn.

8         **A.  Classification.**

9         The crux of the dispute over classification is a legal one: what is the appropriate legal

10  standard for separately classifying unsecured vendor claims under a plan for the purpose of

11  providing those creditors different (typically preferential) treatment under the plan?  USF&G

12  argues that the vendors and their preferential treatment under the plan must be "critical,"

13  "essential," or "necessary" to the success of a debtor's business and its reorganization.  USF&G

14  contends that most of the members of Rexford's proposed Trade Class—and their proposed

15  treatment—do not fall within this rubric.  In its original papers, Rexford had advocated that this

16  was the legal standard and that its proposed Trade Class met that standard.  As of the conclusion of

17  the hearing, however, Rexford had retreated to the position that it need only offer a "business or

18  economic justification" for its proposed separate classification and preferential treatment of the

19  Trade Class.  The Court must decide on the appropriate standard and apply that standard to the

20  facts and circumstances presented.

21         **1.    Legal Standard.**

22         The holders of claims and interests vote on whether to accept or reject a plan of

23  reorganization by class.  *See* 11 U.S.C. §§ 1126(c),(d), 1129(a)(8),(10).  The classification of

24  claims under a plan is proposed by the debtor proposing the plan (or other plan proponent).  *See*

25  11 U.S.C. § 1123(a)(1).  Bankruptcy Code section 1122 provides that claims or interests within a

26  given class must be "substantially similar."  11 U.S.C. § 1122(a).  A claim that is not substantially

27  similar to other claims may not be classified with those claims.  *Steelcase v. Johnston (In re*

28  *Johnston)*, 21 F.3d 323, 327-28 (9th Cir. 1994).  To determine whether claims are substantially

1  similar, "bankruptcy court judges must evaluate the nature of each claim, i.e., the kind, species, or

2  character of each category of claims." *Id.* at 327.

3      A claim that is substantially similar to other claims may be classified separately from those

4  claims, even though section 1122(a) does not say so expressly. *Barakat v. Life Ins. Co. of Va. (In*

5  *re Barakat)*, 99 F.3d 1520, 1524-25 (9th Cir. 1996). Substantially similar claims may be classified

6  separately if there is a "legitimate business or economic justification" for doing so. *Id.* at 1526.

7  Separate classification for the sole purpose of obtaining acceptance of a class of creditors under the

8  plan constitutes "gerrymandering" and is not permitted. *Id.* Subject to these limitations,

9  bankruptcy courts have discretionary authority to approve a debtor's proposed classification

10  scheme. *See In re Johnston*, 21 F.3d at 327; *cf. In re Palisades-On-The-Desplaines*, 89 F.2d 214,

11  217 (7th Cir. 1937) (noting that Congress intended to give the court "broad latitude" in classifying

12  claims under analogous provision of the former Bankruptcy Act).

13      Applying these principles, the Ninth Circuit Court of Appeals, in *In re Johnston,* affirmed

14  the bankruptcy court's decision that a creditor's claim was not substantially similar to those of

15  other unsecured creditors because (i) the creditor was embroiled in litigation with the debtor that

16  could result in the creditor's claim being offset or exceeded by damages in favor of the debtor and

17  (ii) the creditor was partially secured. 21 F.3d at 327. In *In re Barakat*, the Ninth Circuit rejected

18  the separate classification of a lender's unsecured deficiency claim from the claims of other

19  unsecured creditors. 99 F.3d at 1523-26. The court of appeals concluded that the unsecured

20  deficiency claim was substantially similar to other unsecured claims (i.e., trade vendor claims), and

21  noted the bankruptcy court's finding that the debtor failed to offer a business or economic

22  justification for the separate classification. *Id.* at 1523.

23      In *In re Barakat* the Ninth Circuit also had occasion to consider whether the bankruptcy

24  court erred in denying separate classification to trade creditors that continued to do business with

25  the debtor postpetition. *Id.* at 1528-29. The debtor argued that the separate classification was

26  "justified because trade creditors expect to earn profits from future dealings with Debtor." *Id.* at

27  1528. The court of appeals, however, rejected this argument, noting the bankruptcy court's

28  observation that "literally thousands of companies are available to provide the[] services' of the

1  trade creditors, thus none of the trade creditors were essential to Debtor's continued maintenance of

2  the apartment building." *Id.* at 1529.  The court of appeals affirmed the bankruptcy court's

3  decision, holding (i) there was no legal distinction between trade creditor claims and other general

4  unsecured claims, and (ii) the factual basis of the bankruptcy court's classification decision had not

5  been challenged.  *Id.*

6          In support of its analysis, the Ninth Circuit cited *Boston Post Rd. Ltd. Partnership v. FDIC*

7  *(In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994), in which the court affirmed

8  the decisions of the lower courts not to permit the separate classification of trade creditors and the

9  unsecured deficiency claim of the Federal Deposit Insurance Corporation ("FDIC").  The debtor

10  had argued, among other things, that its future viability as a business depended on its treating its

11  trade creditors more favorably than the FDIC.  But the debtor "failed to present any evidence of a

12  legitimate business reason for the separate classification of similarly situated unsecured creditor

13  claimants." *Id.*  As the court explained further:

14                  The trade creditors in Class 4 were few and consisted of a landscaper,
               property appraisers, rubbish removers, and accountants.  None were
15                  essential to BPR's future.  Both lower courts accordingly found an
               absence of a valid justification for the isolation of the FDIC
16                  deficiency claim.  No evidence to the contrary was adduced.

17  *Id.*

18          Here, the parties disagree on the legal standard for determining when it is appropriate to

19  separately classify trade vendor claims from other unsecured claims under a chapter 11 plan.

20  USF&G argues that the separate classification must be "critical," "essential," or "necessary" to

21  Rexford's debtor's reorganization.  USF&G argues that when the purpose of separate classification

22  is to provide preferential treatment to specified trade vendors, the preferential treatment must itself

23  be "critical," "essential," or "necessary" to the success of Rexford's reorganization.  In other

24  words, the debtor must show that without the support of each preferred vendor, Rexford's business

25  would not be able to function or its reorganization would fail.  By contrast, Rexford argues that it

26  need only provide a "legitimate business or economic justification" for such classification and

27  treatment.  Rexford contends that offering preferential treatment under a plan to induce a vendor's

28  post-confirmation support of the debtor is a "legitimate business or economic justification," when

1   the loss of such support can be expected to have a genuine operational or financial impact on the

2   debtor's business.

3          The Ninth Circuit Court of Appeals has not squarely addressed this legal issue.  In *In re*

4   *Barakat,* the debtor argued that the interests of trade vendors in conducting future business with the

5   debtor justified their separate classification from the claim of the FDIC.  The court rejected this

6   argument and found no error on appeal because the debtor did not challenge the factual basis of the

7   bankruptcy court's classification decisions.  99 F.3d at 1529.  The court of appeals noted the

8   bankruptcy court's observation that none of the trade creditors was "essential," but the court of

9   appeals was not required under the circumstances to rule—and did not actually rule—whether this

10  was the appropriate legal standard for assessing the separate classification of vendor claims.  *Id.*

11  Nor did the Second Circuit Court of Appeals reach the issue in *In re Boston Post Rd. Ltd. P'ship.*

12  There, the debtor "failed to present any evidence of a legitimate business reason for the separate

13  classification. . . ."  21 F.3d at 483.  As such, the Second Circuit had no occasion to determine

14  when the separate classification of trade vendor claims is supported by a legitimate business or

15  economic reasons.

16         The Court concludes that when a plan proposes separate classification of trade vendor

17  claims in order to provide preferential treatment to those claims, a "legitimate business or

18  economic justification" is established when (i) the vendors provide genuine operational or financial

19  benefits to the debtor and (ii) the preferential treatment of vendor claims is reasonably calculated to

20  induce the continued support of those vendors.

21         This legal standard is consistent with well-established Ninth Circuit law.  In assessing

22  whether the proposed separate classification of substantially similar claims is appropriate, Ninth

23  Circuit law requires a "legitimate business or economic justification" for doing so.  *In re Barakat*,

24  99 F.3d at 1526.  The proposed preferential treatment of vendors that provide genuine operational

25  or financial benefits to the debtor—in a genuine effort to induce them to continue doing so—is a

26  legitimate business and economic justification for separately classifying the claims of such

27  vendors.  In both *In re Johnston* and *In re Barakat*, the Ninth Circuit sought to distinguish separate

28  classification for the sole purpose of gerrymandering, from those circumstances in which separate

1   classification serves other business or economic objectives.  By requiring that the business or

2   economic justification be "legitimate," the Ninth Circuit made clear that the justification offered

3   must be genuine.  *See* Merriam Webster's Collegiate Dictionary (10th ed., 1996) at 664

4   ("legitimate" defined as "being exactly as purposed: neither spurious nor false").  A justification

5   that is illogical, based on false premises or bearing no logical relationship to the facts and

6   circumstances presented obviously would not be "legitimate."

7        The standard adopted herein accords with the objective of assessing whether a business or

8   economic justification is legitimate.  Vendors holding claims that are separately classified from

9   other unsecured claims must be providing genuine operational or financial benefits to the debtor,

10   and the preferential treatment offered to those vendors must be reasonably calculated to induce

11   their continued support of the debtor.

12        This legal standard also is consistent with authorities from outside the Ninth Circuit holding

13   that the separate classification of trade claims may be justified by a "'reasonable purpose,'

14   legitimate basis or necessary business objective."  *See, e.g., In re Jersey Med. Ctr.*, 817 F.2d 1055,

15   1061 (3d Cir. 1987) (holding that classification of claims or interests must be reasonable and

16   recognizing reasonableness of distinguishing trade creditors' claims); *In re One Times Square*

17   *Assoc. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993) (permitting separate classification of

18   substantially similar unsecured claims where there is "reasonable basis for doing so or, in other

19   words, when the decision to separately classify does not offend one's sensibility of due process and

20   fair play").  It also is consistent with authorities that have recognized the important role that the

21   cooperation of trade creditors plays in the reorganization process, and on this basis, have found

22   separate classification and treatment of vital creditors to be reasonable. *See e.g. In re Richard*

23   *Buick, Inc.*, 126 B.R. 840, 852 (E.D. Pa. 1991); *In re AG Consultants Grain Div., Inc.*, 77 B.R. 665,

24   673 (Bankr. N.D Ind. 1987).

25        A legal standard permitting separate classification of substantially similar claims only

26   where the claims are "critical," "essential," or "necessary" would go far beyond the requirement of

27   a legitimate business or economic justification.  Use of these terms would suggest that separate

28   classification is justified only when it is proven that a debtor's reorganization will not succeed

1   without it.  *See* Merriam Webster's Collegiate Dictionary (10th ed., 1996) at 275  ("critical" defined

2   as "indispensable"), 396 ("essential" defined as "basic," "indispensable," and "necessary"), 776

3   ("necessary" defined as "inescapable," "unavoidable," "compulsory," "absolutely need" and

4   "required").  The requirement of a "legitimate business or economic justification" does not impose

5   such a high bar.  If the Ninth Circuit had intended to do so, it certainly would not have held that a

6   legitimate *justification* would suffice to permit the separate classification of substantially similar

7   claims.  *Id.* at 636 ("justification" defined as something that proves or shows that something is

8   "just, right or reasonable").  Instead, it would have held that such classification is permitted only

9   when *necessary* to achieve the debtor's reorganization.

10          Moreover, a necessity standard would not be practicable.  There is no question that when a

11   debtor seeks to provide preferential treatment to a group of otherwise similar claims, it is necessary

12   to separately classify those claims.  *See* 11 U.S.C. § 1123(a)(4) (a plan must "provide the same

13   treatment for each claim or interest of a particular class unless the holder of particular claim or

14   interest agrees to a less favorable treatment of such particular claim or interest").  But how does a

15   debtor show that the preferential treatment (i.e., the premise for the separate classification) is truly

16   *necessary* (i.e., "inescapable," "unavoidable," "compulsory," "absolutely needed" and "required")?

17   To meet such a standard—logically speaking— the debtor would need to demonstrate (1) the

18   vendor provides necessary goods and services that are not available from alternative vendors, or

19   that are not otherwise available on terms and conditions that will permit the business to reorganize

20   <u>and</u> (2) the vendor will stop providing those goods and services or favorable terms after

21   confirmation of a plan that does not include the preferential treatment of its claim.

22          The first proposition is readily capable of proof, but the second proposition is problematic.

23   First, bankruptcy courts do not have a crystal ball.  They do not predict what *will* or *will not* happen

24   in the future.  At best, they make reasoned judgments about the likelihood of future events based on

25   existing circumstances and historical facts.  *See, e.g.,* 11 U.S.C. § 1129(a)(11) (requirement that

26   "[c]onfirmation of the plan is not likely to be followed by the [liquidation, or the need for further

27   financial reorganization" of the debtor).  Second, as a matter of proof, it is inherently difficult to

28   establish what a vendor will or will not do in the future.  A vendor might be willing to testify that

1  its continued support of the debtor depends on the proposed preferential treatment, but the self-

2  serving nature of the testimony is not likely to yield a satisfying result. *Any* vendor asked whether

3  preferential treatment of its prepetition claim is a prerequisite to its future support of the debtor is

4  likely to say "yes." And even if this were not the case, the debtor would face a substantial (perhaps

5  insurmountable) burden in soliciting and presenting the testimony of potentially dozens or

6  hundreds of vendors to demonstrate that the proposed treatment, in each instance, is necessary (i.e.,

7  "inescapable," "unavoidable," "compulsory," "absolutely needed" and "required") to obtain the

8  continued support of those vendors.

9      The approach adopted here not only avoids these problems, but maintains the doctrinal

10  distinction between (1) whether the separate classification of substantially similar claims is

11  appropriate under Bankruptcy Code section 1122, and (2) whether the proposed treatment of those

12  claims unfairly discriminates for purposes of Bankruptcy Code section 1129(b)(1). *See In re*

13  *Johnston*, 21 F.3d at 323 & n.7. The classification inquiry is aimed at preventing the

14  gerrymandering of a plan vote. *In re Barakat*, 99 F.3d at 1524-25. The unfair discrimination

15  inquiry, by contrast, is aimed at determining whether the disparate treatment of similar claims is

16  fair:

17        Discrimination between classes must satisfy four criteria to be
      considered fair under 11 U.S.C. § 1129(b): (1) the discrimination
      must be supported by a reasonable basis; (2) the debtor could not

18        confirm or consummate the Plan without the discrimination; (3) the
      discrimination is proposed in good faith; and (4) the degree of the

19        discrimination is directly related to the basis or rationale for the
      discrimination.

20

21  *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'shp. (In re Ambanc La Mesa Ltd. P'shp.)*, 115

22  F.3d 650, 656 (9th Cir. 1997) (citing *In re Wolff*, 22 B.R. 510, 511-12 (B.A.P. 9th Cir. 1982)). A

23  separate classification standard requiring proof that a proposed classification scheme is necessary

24  (i.e., "inescapable," "unavoidable," "compulsory," "absolutely needed" and "required") would

25  supplant the unfair discrimination test and improperly conflate the issues.

26      Under the foregoing standard for unfair discrimination, it may be appropriate to consider

27  the extent of the benefit conferred by the members of preferred vendor class (e.g., whether they are

28  critical, necessary or essential to the success of the reorganization), and whether the extent of that

benefit justifies the discrimination proposed against other unsecured creditors.[3]  Any such analysis,

however, must await plan confirmation and the development of a fulsome record.  As noted at the

outset of this opinion, Rule 3013 contemplates consideration and approval of a claim classification

scheme prior to the plan confirmation hearing, but does not contemplate prior consideration of the

unfair discrimination question.  The question of unfair discrimination does not arise until and

unless a debtor seeks confirmation of a plan notwithstanding its failure to satisfy Bankruptcy Code

section 1129(a)(8) (every class either accepts the plan or is not impaired).  As such, the question of

unfair discrimination is simply not yet ripe.

## 2.    Application of Facts to Legal Standard.

The claims classified in the Trade Class are substantially similar to the claims in the

General Unsecured Claims Class.  The claims in both of these classes are nonpriority, unsecured

claims.  There is nothing in the record to suggest they are not substantially similar.  Nevertheless,

the separate classification of the Trade Class from the General Unsecured Claims Class is

appropriate.  The uncontroverted record shows that there is a legitimate business or economic

justification for including most, but not all, of the vendor claims in the proposed Trade Class,

separate and apart from other unsecured claims.

---

[3] The court in *In re Ambanc La Mesa Ltd. P'shp*, recognized this issue, but suggested that the issue, if necessary, be reconsidered on remand through the lens of its four-part unfair discrimination test:

> In affirming on [unfair discrimination], the district court reasoned that "it is legitimate to pay the relatively small claims of trade creditors more quickly than a large deficiency claim" because "prompt payment of such debts promotes good will and enables a debtor to continue to receive goods and services while implementing its recovery." On the other hand, the continued services of ordinary tradespeople may not always be a commercial necessity for an apartment operator in a large metropolitan area with many other providers of those services.  If confirmation is reconsidered on remand, the trade creditors' payoff issue must be resolved by specific evidence and court findings therefrom based upon the four *Wolff* factors.

*In re Ambanc La Mesa Ltd. Pshp.,* 115 F.3d 650, 657 (9th Cir. 1997) (citations omitted).

1    First, the separate Trade Class has been proposed in order to provide preferential treatment

2    to the vendors in the Trade Class—payment of 100% of the claim—in a manner reasonably

3    calculated to induce those vendors to continue supporting Rexford following confirmation of a

4    plan.  Specifically, the proposed treatment of the Trade Class conditions payment of 100% of each

5    vendor's claim on such party's "agreement to continue supplying goods and services to the Debtor

6    for one full operating season post-confirmation in accordance with trade terms at least as favorable

7    to the Debtors as those practices (including pricing, timing of payments, availability, and other

8    terms) in place before the Petition Date." Motion at 4.  Absent such separate classification and

9    preferential treatment, Rexford estimates that the vendors—and all other unsecured creditors—will

10   receive substantially less than 100% of their claims.

11   Second, the following vendors that Rexford proposes to include in its Trade Class provide

12   genuine operational or financial benefits to the Debtor.  For the reasons described below, the Court

13   concludes that there is a legitimate business or economic justification for including the claims of

14   these creditors in the Trade Class:

15   J&D, a local vendor of food, beverage and cleaning supplies stores large

16   quantities of items selected by the Waterpark and provides prompt deliveries when

17   supplies run low.  The alternative vendors are located two hours' drive way, have

18   inflexible delivery schedules and do not store specialty inventory that is available on

19   request.  Further, the uncontroverted testimony was that if forced to replace J&D,

20   Rexford would likely pay 5% more than it currently pays for such goods.

21   Valley Wide is Rexford's exclusive beer distributor, and beer constitutes 22% of

22   Rexford's total food and beverage sales (excluding catering).  Valley Wide is the

23   exclusive distributor in the area of the Waterpark for those brands that are most popular

24   with the Waterpark's demographic, including Corona and Modelo.  By definition, these

25   products are not available to Rexford from other distributors.

26   Dippin' Dots provides a unique ice cream novelty that accounts for 20% of

27   Rexford's total food and beverage sales (excluding catering).  The uncontroverted

28   testimony is that no alternative ice cream product would perform as well as Dippin'

18

1  Dots as an impulse buy, and if it was not available to sell at the Waterpark, Rexford

2  would experience a loss of revenue.

3       Premiere has six years of experience as the advertising and public relations

4  agency for the Waterpark, has specialized knowledge of its operations and advertising

5  needs and exclusive relationships with large retailers for coupon distribution and

6  inclusion in print and television advertising.  The uncontroverted testimony is that

7  because of these relationships Premiere is "irreplaceable" and that, even if this were not

8  the case, it would take five to six years to realize the kind of service Rexford currently

9  enjoys with Premiere.

10       Lotus is the number one radio station in the Waterpark's demographic and is a

11  crucial part of the Waterpark's marketing efforts.  The uncontroverted testimony is that

12  without advertising access to this radio station, the number of visitors to the Waterpark

13  would likely decline by roughly five to seven percent.

14       Stewart is the local contractor responding for the original planning, development

15  and buildout of the Waterpark and has substantial knowledge of the pumps, motors,

16  relays, electrical systems, filtration systems and other features of the Waterpark.  The

17  uncontroverted testimony is that Stewart is a "one stop shop" for maintenance and

18  mechanical issues, and saves Rexford "significant" amounts of money based on his

19  extensive knowledge of the Waterpark.

20       Cumulus is one of the largest radio broadcasting companies in the Fresno area

21  and carries channels that are among the top in the local market, including those

22  targeting the Waterpark's demographic.  The uncontroverted testimony is that if

23  Rexford did not have access to these channels, Rexford's revenue would be reduced by

24  roughly five to seven percent.

25       Jakes is the only certified company that Rexford has been able to identify in

26  California that is qualified to perform mandatory annual quality safety inspections.  The

27  uncontroverted testimony is that out-of-state inspectors would charge exorbitant fees for

28  travel.

19

1        Power is the only vendor in the Central Valley (in which Fresno is located) that

2        Rexford has been able to identify as being able to provide the Waterpark with the

3        necessary ground fault electrical systems test in the event of an emergency black-out.

4        When such a black out occurs, it creates a severe issue that significantly impacts the

5        Waterpark's operations.

6        Fresno Pipe is the only vendor in Fresno that carries the specialty, industrial

7        plumbing and piping that the Waterpark uses for its filtration and attractions.  The

8        uncontroverted testimony is that when needed, the materials provided by Fresno Pipe

9        are often needed to address mechanical emergencies that may shut down one or more

10        attractions until the materials can be obtained and the repairs made.  The uncontroverted

11        testimony is that alternative suppliers of these materials are out of town and would

12        require two or more days to deliver those materials.

13        FNF provides roll-off and dumpster services at prices and with response times

14        that are better than the alternatives.  The uncontroverted testimony is that any other

15        vendor would cost Rexford 50% more than FNF.

16    In contrast, the Court finds the evidence inadequate with respect to the following vendors to

17  conclude that there is a legitimate business or economic justification for including these vendors in

18  the Trade Class:

19        Sierra is the only bulk chlorine and muriatic acid distributor in the Fresno area.

20        Because other local sellers purchase these products from Sierra, Watson's testimony

21        suggests that Rexford would pay more for these products if it purchased them from

22        those sellers.  But this suggestion is based on assumptions for which there is no

23        foundational evidence: i.e., that local sellers pay the same prices to obtain bulk product

24        from Sierra and that, even with a markup, Rexford would be paying more than it

25        currently pays.  Further, Watson's testimony does not address whether these products,

26        which essentially are commodities, are available at competitive prices from non-local

27        sources.

28

Barry Owen is a provider of 70% of Rexford's gift shop merchandise, including what Watson describes as "difficult-to-find" gift shop merchandise. No detail was provided as to what is "difficult-to-find" about this merchandise. Rexford likes the pricing, quick delivery and manner in which Barry Owen maintains its inventory, but there is no evidence establishing that similar merchandise, pricing and delivery commitments are not available from alternative vendors. Nor is there any evidence quantifying the financial impact of this vendor's prices on Rexford or the potential financial impact if Rexford were required to replace this vendor.

Swimsuit Station provides "off-price" swimwear at "a fraction of the price" than other wholesalers charge. Watson testified that Rexford has tried on multiple occasions to identify an alternative vendor with "comparable offerings" at "similar prices" and has not been successful. However, Watson's testimony does not provide any detail on what "comparable offerings" means or what "similar prices" means. In other words, there is no evidence quantifying the financial impact of this vendor's prices on Rexford or the potential financial impact if Rexford were required to replace this vendor.

Accordingly, the Court will approve the proposed classification scheme, provided that the claims of Sierra, Barry Owen and Swimsuit Station are not included in the Trade Class.

**B. Impairment.**

The relief requested by Rexford regarding "impairment" was not opposed by USF&G. Nevertheless, the Court will address and analyze this request for relief.

Confirmation of a plan generally requires that each class of claims or interests under a plan either accept the plan or not be impaired under the plan. *See* 11 U.S.C. § 1129(a)(8). If this condition is not met, a plan may be "crammed down" over the rejection of an impaired class if the requirements for doing so are satisfied. *See* 11 U.S.C. § 1129(b). Confirmation of a plan also requires that if a class of claims is impaired under the plan, at least one impaired class of claims accepts the plan, not counting the votes of insiders. *See* 11 U.S.C. § 1129(a)(10).

1    Bankruptcy Code section 1124 defines impairment.  In relevant part, it provides "a class of

2 claims or interests is impaired under a plan unless, with respect to each claim or interest of such

3 class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim

4 or interest entitles the holder of such claim or interest."  11 U.S.C. § 1124.  Under this broad

5 definition, "'any alteration of the rights constitutes impairment even if the value of the rights is

6 enhanced.'"  *In re L & J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993) (quoting *In re*

7 *Acequia*, 787 F.2d 1352, 1363 (9th Cir. 1986)).

8    The proposed Trade Class described in the present motion is clearly "impaired" within the

9 meaning of section 1124.  Under the proposed treatment of the Trade Class claims, the holders of

10 trade claims will be provided payment equal to 100% of the allowed amount of their claims, but as

11 a condition to such treatment they will be required to agree to continue providing goods and

12 services to Rexford on terms and conditions no less favorable than currently provided.  The

13 imposition of this condition is an alteration of the rights of the holders of the claims in the Trade

14 Class, even if the treatment overall results in full payment.

### CONCLUSION

16    For the reasons described herein, the Court will enter an order granting Rexford's motion

17 under Federal Rule of Bankruptcy Procedure 3013: (i) approving the classification scheme

18 described in its motion, provided that the claims of Sierra, Barry Owen and Swimsuit Station are

19 not included in the Trade Class, and (ii) finding that the proposed treatment of the Trade Class

20 claims constitutes impairment.

Date: September 28, 2016

————————————————————
Martin R Barash
United States Bankruptcy Judge